United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALANY JEAN HELMANTOLER et al.,

Plaintiffs,

v.

CITY OF CONCORD et al.,

Defendants.

Case No.  14-cv-02855-HSG

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. No. 33

## I.   INTRODUCTION

Plaintiffs Alany Jean Helmantoler ("Alany") and her minor children T.H., K.H., and M.H. (collectively "Plaintiffs") bring this action against the City of Concord ("Concord") and individual officers O'Brien, Donnelly, Golinveaux, and Elsberry (collectively "Defendants") under 42 U.S.C. § 1983 and California common law.  Plaintiffs assert five causes of action based on a warrantless entry of Plaintiffs' home on August 12, 2013:  (1) civil rights claims for unreasonable search and excessive force against O'Brien and Donnelly; (2) a *Monell* claim against Concord; (3) a battery claim against O'Brien and Donnelly; (4) a false imprisonment claim against all Defendants; and (5) an intentional infliction of emotional distress claim against all Defendants.  On September 23, 2014, the Court bifurcated the *Monell* claims and related proceedings.  Dkt. No. 24.  Defendants bring this motion for partial summary judgment on the first, third, fourth and fifth causes of action only.  The Court heard oral argument on the motion on May 7, 2015.  Having carefully considered the parties' written and oral arguments, and the entire record, the Court GRANTS in part and DENIES in part Defendants' motion for partial summary judgment.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if

United States District Court
Northern District of California

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Only genuine disputes over material facts will preclude summary judgment; "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those that may affect the outcome of the case. A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Id.* "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citation omitted). This is true where the underlying facts are undisputed as well as where they are in controversy. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 541 (1992); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009).

The moving party must inform the district court of the basis for its motion and identify those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Liberty Lobby*, 477 U.S. at 250. The opposing party need not show the issue will be resolved conclusively in its favor. *Liberty Lobby*, 577 U.S. at 248-49. All that is necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial. *Id.*

## III.   FACTS

The relevant facts giving rise to the instant lawsuit are undisputed, except where noted. On August 12, 2013, at approximately 5:15 p.m., Defendants O'Brien and Donnelly were dispatched to the Helmantoler residence at 3724 Edmonton Way in Concord, California, in response to a 911

1    telephone call received by the Concord Police Department ("CPD").  Blechman Decl. Ex. B

2    (Incident Detail Report); Ex. C ¶ 4 (Donnelly Decl.); Ex. F (911 Dispatch Transcript).  The 911

3    caller, who asked to remain anonymous, claimed to be a neighbor who had overheard what

4    sounded like yelling coming from the backyard of the Helmantoler residence.  *See* 911 Dispatch

5    Tr. at 2:16-3:21.  Specifically, the caller claimed she heard a high–pitched voice yell "Get off of

6    me.  Don't touch me."  *Id.* at 2:18-19.  The caller stated that "[she didn't] know if it [was] just kids

7    screaming like obnoxiously . . . or what."  *Id.* at 2:22-24.  She further stated that there were three

8    children living in the home, one of whom was a teenager and another who was hearing impaired

9    and sometimes screamed.  The caller did not believe that the screaming she heard on that day

10   sounded like the hearing impaired child.  *Id.* at 3:8-10.

11           Officers Donnelly and O'Brien received the information regarding children yelling at the

12   Helmantoler residence from the 911 dispatcher and responded to the call.  While en route to the

13   residence, the officers received updates from the 911 dispatcher giving them further details about

14   the Helmantoler family.  The dispatcher informed the officers that there were three children in the

15   home, one of whom was hearing impaired, and that it was unknown whether the parents were in

16   the home.  Incident Detail Rep., 1.  The officers also received information about Michael

17   Helmantoler, Alany Helmantoler's estranged husband, who no longer lived in the residence.  *Id.*

18   Michael, the officers learned, had been arrested in 2013 for criminal threats, was reportedly

19   schizophrenic, and had a domestic violence restraining order against him.  911 Dispatch Tr. at

20   20:11-13; Incident Detail Rep., 1.

21           The Helmantoler residence is a typical single–story, single–family home with an attached

22   garage.  Vanegas Decl. Ex. 1, CPD-0002 (Offense Report); Ex. 5 at 10:14-24 (O'Brien Dep.).  On

23   the day of the incident, the garage door was closed.  Offense Rep., CPD-0002; 911 Dispatch Tr.

24   3:19-20.  The three children were at home, but their mother, Alany Helmantoler, was not, having

25   left the house about half an hour earlier.  Vanegas Decl. Ex. 2 at 36:3-10, 43:8-16 (T.H. Dep.).

26           Upon arriving at the Helmantoler residence, Officers Donnelly and O'Brien, who were in

27   uniform, walked up to the front door.  Blechman Decl. Ex. C ¶ 4; Ex. D at 14:13-23.  The house

28   was quiet at that point.  Vanegas Decl. Ex. 6 at 15:4-14, 64:2-15 (Donnelly Dep.); Ex. 5 at 10:6-

United States District Court
Northern District of California

1   13, 31:20-32:12.  Donnelly and O'Brien found that the front door to the house was open, with the

2   metal screen door in front of the main wooden door closed but unlocked.  Offense Rep., CPD-

3   0002; Vanegas Decl. Ex. 5 at 10:14-24.  O'Brien opened the screen door.  Offense Rep., CPD-

4   00013; Vanegas Decl. Ex. 2 at 46:4-10; Blechman Decl. Ex. E at 10:25-11:13 (O'Brien Dep.).

5        Realizing the police were on the front porch, T.H., the oldest child, came to the door.

6   Vanegas Decl. Ex. 2 at 43:13-20.  The officers believe that T.H. was on the phone at the time.

7   Incident Rep., CPD-0002; Blechman Decl. Ex. D at 16:3-5; Vanegas Decl. Ex. 2 at 43:13-20.

8   T.H. acknowledges that she had been on the phone with her mother, but does not recall whether

9   she had ended the call before encountering the officers.  Vanegas Decl. Ex. 2 at 43:18-23, 44:7-13.

10   Both parties agree that T.H. had been in contact with her mother and that her mother thus knew the

11   police were at the home.  Vanegas Decl. Ex. 2 at 44:10-19; Blechman Decl. Ex. D at 22:3-6.  In

12   response to T.H. telling Alany that the police were there, Alany told T.H. that she was on her way

13   home.  Vanegas Decl. Ex. 2 at 44:17-19.

14        When T.H. came to the front door to meet the officers, she attempted to close the already–

15   open screen door, but was prevented from doing so by O'Brien, who had wedged his foot in front

16   of the door to keep it from closing.  Vanegas Decl. Ex. 5 at 14:2-21; Offense Rep., CPD-00013;

17   Blechman Decl. Ex. D at 24:4-15.  As T.H. attempted to close the screen door, one of the officers

18   told her not to do so.  Vanegas Decl. Ex. 2 at 56:18-21, 57:1-3; Offense Rep. CPD-0002;

19   Blechman Decl. Ex. D at 24:13-15.  Donnelly and O'Brien observed that T.H. appeared upset and

20   recently had been crying.  Blechman Decl. Ex. D at 16:3-5; Offense Rep., CPD-0002; Vanegas

21   Decl. Ex. 2 at 45:9-18.  Before the officers arrived, T.H. had been in an argument with her sister,

22   though there is no indication in the record that she explained this to the officers.  Vanegas Decl.

23   Ex. 2 at 36:7-16; Vanegas Decl. Ex. 7 at 12:4-9 (M.H. Dep.); Blechman Decl. Ex. G at 50:14-19

24   (T.H. Dep.).  By the time the officers arrived, according to T.H., she had just finished crying and

25   she and her sisters were starting to calm down.  Vanegas Decl. Ex. 2 at 45:13-18, 50:6-16.  When

26   Donnelly inquired if everything was okay, T.H. responded with words to the effect that everything

27   was "okay now."  *Id.* at 50:6-16; Blechman Decl. Ex. D at 18:19-22.

28        Before explaining why they were there, Donnelly asked T.H. if he and his partner could

United States District Court
Northern District of California

enter the house.  Vanegas Decl. Ex. 2 at 51:13-18.  T.H. replied that the officers could not do so because they did not have a warrant.  *Id.* at 51:13-16.  Though T.H. disputes that the officers ever told her they were specifically concerned with an intruder in the house, she thinks that at some point one of the officers explained that they needed to enter the home to verify that everyone was safe.  Vanegas Decl. Ex. 2 at 57:18-20.[1]  The record is unclear as to exactly when these statements were made.

During the course of the initial conversation with Donnelly and O'Brien, T.H. informed the officers that her mother was on her way home.  Vanegas Decl. Ex. 2 at 60:8-14; Blechman Decl. Ex. D at 22:3-6.  According to T.H., despite being told that her mother was on the way home, Donnelly proceeded to question her in an apparent attempt to enter the home without a warrant.  T.H. answered some of Donnelly's questions but declined to answer others.  Vanegas Decl. Ex. 2 at 54:19-55:16.  T.H. remembers telling the officers that her little sisters, M.H. and K.H., were in the home, and she believes she told them her age.  *Id.* at 55:7-25.  According to T.H., when she informed the officers that she was not going to answer their questions or let them into the house, they threatened to arrest her.  *Id.* at 53:24-54:11.  Nonetheless, T.H. refused to allow the officers to enter the house without a warrant and informed them that she would not answer any questions until her mother returned.  *Id.* at 57:21-25.

While T.H. was talking with the officers, her younger sister, K.H., appeared behind her. *Id.* at 58:12-15; Blechman Decl. Ex. D at 25:19-26:3; Ex. I at 66:8-14 (Donnelly Testimony). Donnelly asked K.H. if she was okay, but he could not understand K.H.'s response and presumed that K.H. had some kind of disability.  Offense Rep., CPD-0002; Blechman Decl. Ex. I at 66:8-14. In fact, K.H. has a hearing disability, a speech impediment, mild cerebral palsy, and mild mental retardation.  Vanegas Decl. Ex. 8 at ¶ 5 (Alany Helmantoler Decl.).  Donnelly and O'Brien observed that K.H. appeared frightened.  Vanegas Decl. Ex. 6 at 26:3-14.  According to Donnelly, T.H. then told K.H. not to speak to him.  Offense Rep., CPD-0002; Vanegas Decl. Ex. 6 at 26:11-16.  T.H. does not remember whether she said this.  Blechman Decl. Ex. I at 58:16-24.  Around

---

[1]  T.H.'s younger sister M.H. heard the officers say that they were there "to check on us . . .[t]o make sure everybody in the house is all right."   Blechman Decl. Ex. H at 21:14-21 (M.H. Dep.).

United States District Court
Northern District of California

1  this time, Donnelly asked to speak to T.H.'s mother, Alany, on the phone.  Vanegas Decl. Ex. 2 at

2  62:7-13.  T.H. called her mother again, but did not give Donnelly or O'Brien the opportunity to

3  speak to her.  T.H. told the officers that her mother was on Olivera Road (a nearby street) and that

4  she would be home soon.  *Id.* at 62:20-63:11.   According to T.H., she did not pass the phone to

5  Donnelly or O'Brien because her mother was on a motorcycle and it would have been impossible

6  for them to have a conversation with her.  *Id.* at 63:12-17.

7         When Alany returned home on her motorcycle, she parked it in the driveway before

8  proceeding to the home's back entrance.  Vanegas Decl. Ex. 4 at 49:14-22 (Alany Helmantoler

9  Dep.).  Though Alany turned off her motorcycle engine before entering her driveway, she believes

10  that the officers heard her approach since the "motorcycle's extremely loud and you can hear it

11  coming from almost a mile away."  *Id.* at 115:1-2.  O'Brien admitted hearing something "coming

12  from the driveway area," but did not know what the sound was.  Vanegas Decl. Ex. 5 at 16:4-13.

13  Donnelly, on the other hand, claimed not to have heard the motorcycle, and said that he went to

14  inspect the driveway after O'Brien reported that he "heard something from the driveway."

15  Blechman Decl. Ex. I at 31:6-20 (Donnelly Testimony).  Donnelly found a motorcycle in the

16  driveway that had not been there previously.  *Id.* at 31:10-16.  Donnelly explained that he

17  associated the motorcycle's quiet arrival with a purposeful attempt to make a noiseless approach

18  behind the officers' backs, an interpretation Alany vigorously disputes.  Blechman Decl. Ex. D at

19  76:24-77:18; Vanegas Decl. Ex. 4 at 114:23-115:18.

20         Shortly after Donnelly observed the motorcycle in the driveway, Alany entered her home

21  through the back sliding door.  Vanegas Decl. Ex. 4 at 51:17-19.  She did so in order to check on

22  her children.  *Id* at 49:14-24.  When she entered the house, Alany first went to speak with her

23  disabled child, K.H.  K.H. appeared frightened but otherwise unharmed, and informed her mother

24  that the police were at the house.  *Id.* at 74:3-19.  Alany then put down her motorcycle helmet and

25  approached the front door, where T.H. and the officers were talking.  *Id.* at 77:11-19.  She told

26  T.H. "I have this," and tried to address the officers.  *Id.* at 77:11-19, 119:2-5.  At this point,

27  according to Alany and T.H., at least one of the officers was already fully inside of the house.

28  Vanegas Decl. Ex. 2 at 65:13-66:6; Ex. 4 at 119:10-120:1.  As Alany attempted to ask the officers

United States District Court
Northern District of California

1   what they were doing in her house, Donnelly pushed T.H. aside, and then both officers grabbed

2   Alany and forcibly removed her from the house.  Vanegas Decl. Ex. 4 at 77:18-22, 120:2-10; Ex.

3   2 at 66:7-12.  O'Brien then handcuffed Alany and placed her on the front lawn.  Offense Rep.,

4   CPD-0003; Blechman Decl. Ex. J at 154:12-17 (Alany Helmantoler Dep.).

5        As her mother was being removed from the house, T.H. closed the wooden door and

6   locked the handle.  Vanegas Decl. Ex. 2 at 67:8-24.  In response, Donnelly kicked the door open,

7   and it hit T.H. in the shoulder.  Offense Rep., CPD-0003; Vanegas Decl. Ex. 2 at 69:22-70:1,

8   89:24-90:1.  At this point, a pushing match ensued between Donnelly and T.H. on opposite sides

9   of the closed wooden door.  Vanegas Decl. Ex. 2 at 71:1-24.  Donnelly wedged his baton in the

10  door to keep it open.  Vanegas Decl. Ex. 2 at 72:9-16; Ex. 6 at 42:5-10.  Donnelly eventually

11  passed the baton over to O'Brien to keep the door from closing, though the record is unclear as to

12  when this happened.  Blechman Decl. Ex D at 43:23-25.  During the time that T.H. was behind the

13  door, the officers continued to urge her to open the door, telling her that Alany was cooperating

14  and that she could "just open the door."  Vanegas Decl. Ex. 2 at 73:10-23.  T.H. didn't believe

15  them and called the officers liars.  *Id.* at 73:7-8; Vanegas Decl. Ex. 5 at 23:22-25; Ex. 6 at 43:17-

16  20.  Both O'Brien and Donnelly were wearing a standard duty belt which includes a firearm,

17  baton, taser, and pepper spray.  Vanegas Decl. Ex. 5 at 12:3-8; Ex. 6 at 18:4-10.  According to

18  T.H., when she looked through the door opening, she saw an officer holding what looked like a

19  can of pepper spray.  Vanegas Decl. Ex. 9 ¶ 3 (T.H. Decl.).  She pleaded with the officer not to

20  spray her.  *Id.*

21       After hearing her mother being pulled out of the door, M.H., the youngest child, ran out of

22  her room to check on her sister.  Vanegas Decl. Ex. 7 at 29:25-30:4.  M.H. saw T.H. at the front

23  door attempting to keep the door closed and then went to check on K.H.  *Id.* at 30:3-4, 16-22.  She

24  grabbed K.H., ran into the garage, and got into the family car.  *Id.* at 30:1-4; Blechman Decl. Ex.

25  H at 51:22-52:18; Offense Rep., CPD-0006.  From the front window of the house, Donnelly saw

26  the two girls run into the garage screaming.  Offense Rep., CPD-0003.  Throughout this time,

27  Alany was detained, in handcuffs, either in front of the house or in the back of a patrol car.

28       While Alany was in the back of the patrol car, she sent text messages to her babysitter

United States District Court
Northern District of California

1  Kaylie Woods, her estranged husband Michael Helmantoler, and two other people requesting help.

2  Vanegas Decl. Ex. 4 at 30:23-31:10, 155:5-17.

3      At about the same time that K.H. and M.H. ran into the garage and locked themselves

4  inside the car, CPD Officers Elsberry and Golinveaux arrived at the house.  Offense Rep., CPD-

5  0003.  The garage was still closed when they arrived.  Offense Rep., CPD-0002, CPD-0006.

6      Donnelly then instructed Golinveaux to check the home's perimeter.  Offense Rep., CPD-

7  0006.  Golinveaux did so, and after finding the perimeter of the home secure, he requested the

8  garage door opener from Alany.  Id.; Vanegas Decl. Ex. 4 at 176:1-11.  Alany told Golinveaux

9  that the opener was on her keychain.  Using the opener, Golinveaux opened the garage.  Offense

10 Rep., CPD-0006; Vanegas Decl. Ex. 4 at 176:1-11.  Golinveaux entered the garage and found

11 K.H. and M.H. crying and holding hands in the backseat of the locked car.  Offense Rep., CPD-

12 0006; Blechman Decl. Ex. H at 54:10-14 (M.H. Dep.); Ex. K ¶ 3 (Golinveaux Decl.).  According

13 to Alany, when Golinveaux opened the garage door, he had his gun out for a few seconds and

14 pointed it in the direction of K.H. and M.H. before re-holstering it as he approached the car.

15 Vanegas Decl. Ex. 4 at 172:1-22, 174:12-21, 176:12-15.  Golinveaux attempted to get the children

16 to talk to him.  Offense Rep., CPD-0006; Blechman Decl. Ex. K. ¶ 3.  An officer asked M.H. if

17 she was scared of something, to which she replied, "You."  Vanegas Decl. Ex. 7 at 50:15-18,

18 50:22-51:1.  After he observed that the children in the car were not injured, and that there were no

19 criminal suspects in the garage, Golinveaux left the garage to talk to the children's babysitter,

20 Kaylie Woods, who had arrived in response to Alany's text messages.  Offense Rep., CPD-0006;

21 Blechman Decl. Ex. K ¶ 3.

22     At this point, after the officers had been at the house for approximately 20 minutes,

23 Michael Helmantoler called the police to request a "welfare check" on his wife and children.  911

24 Dispatch Tr. at 29:8-15.

25     Overhearing that the officers were going to attempt to force entry into the home by cutting

26 a window, Alany called Elsberry, who she knew, over to the police car where she was detained.

27 Vanegas Decl. Ex. 4 at 228:15-229:10.  Elsberry asked Alany if she knew why the officers

28 were there and she responded that she did not.  Id. at 159:12-23.  Elsberry told Alany that the officers

United States District Court
Northern District of California

wanted to conduct a welfare check on the children. *Id.* at 159:24. After a brief discussion with Elsberry, Alany agreed to allow the officers to perform a welfare check of the home provided that they left her children alone. *Id.* at 159:25-160:17; Blechman Decl. Ex. J at 164:14-24. The officers removed Alany from the patrol car and escorted her to the front door while she was still in handcuffs. Offense Rep., CPD-003. She then told T.H. to open the door and allow the officers into the house. Vanegas Decl. Ex. 4 at 230:10-14; Blechman Decl. Ex. J at 165:4-9. Alany allowed Elsberry and Donnelly to enter the house so they could assure themselves that no one was hiding or injured inside. Vanegas Decl. Ex. 4 at 230:4-24; Blechman Decl. Ex. J at 165:23-167:25. Alany escorted the officers on the search of the house and backyard. *Id.* During the welfare check the officers did not open any drawers or cabinets. Blechman Decl. Ex. J at 166:19-167:3. The search was brief, lasting approximately three minutes, and was limited to areas where a person could have been hiding. *Id.* at 166:19-167:10. The officers did not find anyone in the home, garage, or backyard apart from Alany and her children.

After conducting the brief search, the officers arrested Alany for resisting arrest. Offense Rep., CPD-0004. Kaylie Woods and Jim Woods remained behind to take care of the children. *Id.* at CPD-0003.

## IV.    DISCUSSION

### A.    Section 1983 Claims

Plaintiffs assert that Defendants violated their Fourth Amendment rights in two ways: (1) by entering the Helmantoler home without a warrant, and (2) by using excessive force in the course of the warrantless search. Defendants contend that they are entitled to summary judgment on these claims based on qualified immunity, in addition to denying that they committed any constitutional violation.

#### 1.    Qualified Immunity

Qualified immunity is an entitlement, provided to government officials in the exercise of their duties, not to stand trial or face the other burdens of litigation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests — "the need to hold public officials accountable when they exercise power

9

United States District Court
Northern District of California

1  irresponsibly and the need to shield officials from harassment, distraction, and liability when they

2  perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (internal quotation

3  marks and citation omitted).   The doctrine thus intends to take into account the real–world

4  demands on officials such as police officers in order to allow them to act "swiftly and firmly" in

5  situations where the rules governing their actions are often "voluminous, ambiguous, and

6  contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  "The purpose of this

7  doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily

8  paralyze their ability to make difficult decisions in challenging situations, thus disrupting the

9  effective performance of their public duties." *Id.*

10        To determine whether an officer is entitled to qualified immunity, the Court must consider

11  whether (1) the officer's conduct violated a constitutional right and (2) that right was clearly

12  established at the time of the incident.  *Pearson*, 555 U.S. at 232.  Courts are not required to

13  address the two qualified immunity issues in any particular order, and instead may "exercise their

14  sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

15  addressed first in light of the circumstances in the particular case at hand." *Id.* at 243.

16        With respect to the second prong of the qualified immunity analysis, the Supreme Court

17  has recently held that "[a]n officer cannot be said to have violated a clearly established right unless

18  the right's contours were sufficiently definite that any reasonable official in his shoes would have

19  understood that he was violating it, meaning that existing precedent . . . placed the statutory or

20  constitutional question beyond debate." *City & Cnty. of San Francisco, Calif. v. Sheehan,* 135 S.

21  Ct. 1765, 1774 (2015) (citation and internal quotation marks omitted).  This is an "exacting

22  standard" which "gives government officials breathing room to make reasonable but mistaken

23  judgments by protecting all but the plainly incompetent or those who knowingly violate the law."

24  *Id.* (citation and internal quotation marks omitted).  In conducting this analysis, the Court must

25  determine whether the pre-existing law provided defendants with "fair warning that their conduct

26  was unlawful." *Elliot-Park v. Mangola*, 592 F.3d 1003, 1008 (9th Cir. 2010).

27        In order to determine whether a triable issue of fact exists as to whether Donnelly and

28  O'Brien are entitled to qualified immunity, the Court thus considers the state of the law at the time

of the alleged violation, as well as the information possessed by the officers at the time of search and the officers' actions viewed in the light most favorable to plaintiffs. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866-68 (2014).

The Court finds it appropriate to address the second prong of the qualified immunity test first. For the reasons set forth below, and resolving all factual disputes in Plaintiffs' favor, as it must at the summary judgment stage, the Court finds that the doctrine shields Defendants from liability as a matter of law with respect to Plaintiffs' Fourth Amendment claims.

### 2.      Warrantless Entry and the Emergency Exception

Searches and seizures inside a home and its curtilage without a warrant are presumptively unreasonable. *United States v. Struckman,* 603 F.3d 731, 738 (9th Cir. 2010). This presumption is rebuttable. *Id.* at 737-38. "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *United States v. Martinez,* 406 F.3d 1160, 1164 (9th Cir. 2005).

Here, Defendants rely on the "emergency" exception to the warrant requirement to justify their entry into the Helmantoler home. The emergency exception applies when "(1) in considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need." *United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).   This exception is "narrow," and its boundaries are "rigorously guarded" to prevent any expansion that would unduly interfere with the sanctity of the home. *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009).

### 3.      Clearly Established Law in August 2013 Did Not Establish that Any Reasonable Officer in Donnelly and O'Brien's Shoes Would Have Known that the Actions Taken in this Case Were Illegal

#### a.      Warrantless Search Claim

Plaintiffs base their Fourth Amendment claim on two warrantless entries by CPD officers: (1) Donnelly and O'Brien's entry into the entryway of the house prior to Alany's arrest;[2] and (2)

---

[2] Defendants have not moved for summary judgment regarding Alany's arrest itself.  Reply at 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

the eventual welfare check conducted in Alany's presence after she agreed to allow the officers into the house.  Opp. at 8-13.  While the Court is not entirely convinced that an objectively reasonable basis to make the first entry existed within the meaning of the emergency exception, it finds that the contours of the law in August of 2013 did not establish "beyond debate" that these two entries were unlawful.

In a number of cases prior to August 2013 in which officers relied upon the emergency exception to the warrant requirement based on 911 calls or other information reporting a potential emergency, the Ninth Circuit upheld the officers' entry as objectively reasonable in light of the factual circumstances presented at the time.  *See United States v. Brown*, 392 Fed. App'x. 515 (9th Cir. 2010) (finding officers' warrantless entry into an apartment lawful under the emergency exception; two 911 calls and a crying victim found at the scene provided sufficient basis for the officers to enter the apartment in order to ensure that no one inside was seriously injured or posed a potential danger); *United States v. Brooks*, 367 F.3d 1128 (9th Cir. 2004) (upholding constitutionality of a warrantless search under the emergency exception where police officers received a 911 call from a hotel guest who reported a loud domestic argument in the room next to hers); *United States v. Bradley*, 321 F.3d 1212, 1215 (9th Cir. 2003) (finding officers' warrantless entry into home justified under the emergency doctrine; recently-arrested woman reported that her child was at home with a friend, but no one answered the door when officers knocked on the door, and child ultimately was found in the house alone).  Similarly, in *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005), cited in Plaintiffs' Opposition, the Ninth Circuit affirmed the district court's finding that the emergency exception applied where officers responding to a 911 call concerning a domestic disturbance found a crying woman at the scene, and heard angry yelling from the interior of a house.  Though these cases necessarily involved facts that are not identical to the ones here, the Court finds that they share enough common elements to preclude a conclusion that it was "beyond debate" that the officers' entries in this case were necessarily unlawful under the Fourth Amendment.

Plaintiffs do not appear to contend that the manner in which the consented-to welfare check search was conducted was unreasonable in itself.  Instead, they argue that Alany's consent

1  was "insufficiently attenuated from the illegal entry of her home so as to remove the taint of the

2  Fourth Amendment violation." Opp. at 13. But Defendants do not base their argument solely on

3  consent: they argue that all of the entries were lawful (or at a minimum not clearly illegal) under

4  the emergency exception. As explained above, the Court agrees that it was not "beyond debate"

5  that the first entry was illegal, and thus need not address Plaintiffs' "attenuation" argument

6  regarding the welfare check. Moreover, the Court cannot conclude that any reasonable officer

7  would know that a welfare check search conducted in this manner (three minutes long and limited

8  to places where a person might be found) and under these circumstances (Alany agreed to the

9  search, let the officers into the home, and accompanied them on the search) was inherently

10  unlawful.

11          Plaintiffs point to no authority, from the Supreme Court or any Court of Appeals, in

12  support of a contrary conclusion. *Kentucky v. King*, 131 S. Ct. 1849 (2011), cited in Plaintiffs'

13  Opposition, lends no support to Plaintiffs' position for at least two reasons. First, it involved the

14  exigent circumstances exception based on the need to prevent destruction of evidence, rather than

15  the emergency exception. *Id.* at 1856-58. Second, *King* expressly *rejected* Plaintiffs' position that

16  the exigency exception does not apply if "the police . . . manufacture or contribute to the

17  exigency." *Compare* Opp. at 11 with *King*, 131 S. Ct. at 1858-59 (rejecting as "unsound" the

18  position that "police may not rely on an exigency if it was reasonably foreseeable that the

19  investigative tactics employed by the police would create the exigent circumstances") (citations

20  and internal quotation marks omitted).

21          Plaintiffs' reliance on *United States v. Perea-Rey*, 680 F.3d 1179 (9th Cir. 2012), is

22  similarly inapt. In that case, the defendants relied on the so-called "knock and talk" exception to

23  justify entering a carport without a warrant to talk with a suspect, and did not argue on appeal that

24  exigent circumstances existed. *Id.* at 1187-89. In that context, the Ninth Circuit found that "once

25  an attempt to initiate a consensual encounter with the occupants of a home fails, the officers

26  should end the knock and talk and change their strategy by retreating cautiously, seeking a search

27  warrant, or conducting further surveillance." *Id.* at 1188 (citation and internal quotation marks

28  omitted). *Perea-Rey* did not address the emergency exception at all, and did not, as Plaintiffs

1    suggest, create a general rule that officers acting in their community caretaking capacity have a

2    duty to retreat under circumstances that could lead a reasonable officer to believe an emergency

3    was occurring.  The Court declines to adopt such a rule in this case.

4         In response to the Court's questions at oral argument, Plaintiffs' counsel cited *Chew v.

5    Gates*, 27 F.3d 1432 (9th Cir. 1994), and *Espinoza v. City and Cnty. of San Francisco*, 598 F.3d

6    528 (9th Cir. 2010), as the cases she believed clearly established that the officers' conduct here

7    violated the law.  Neither case does so.  In *Chew*, a case involving an excessive force claim based

8    on the deployment of a police dog, the Ninth Circuit *affirmed* the district court's grant of qualified

9    immunity to the individual officers.  27 F.3d at 1450.  *Espinoza* did involve the application of the

10   emergency exception, but the only evidence cited there to support application of the exception

11   was:  (1) a neighbor's report that the front door had been swinging open and that the house

12   "might" be a "drug house"; (2) the officer's report that he saw several "unknown items" through a

13   window; and (3) a security officer's statement that the unit was supposed to be vacant and that the

14   front door lock was not an approved model installed by the landlord.  598 F.3d at 534.  Those facts

15   differ markedly from those here, as explained in detail above.  Accordingly, neither of these cases

16   comes close to establishing that it was "beyond debate" in August of 2013 that any reasonable

17   officer would know that Donnelly and O'Brien's actions were unlawful in the situation they

18   confronted.

19        In sum, construing the facts in the light most favorable to Plaintiffs, and applying the

20   "exacting" qualified immunity standard, the Court finds no triable issue of fact necessary to

21   determine whether any reasonable official in Donnelly and O'Brien's position would have

22   understood his actions to violate clearly established law.  As a result, the Court finds that Donnelly

23   and O'Brien are entitled to qualified immunity as to Plaintiff's Fourth Amendment unlawful

24   search claim in the First Cause of Action, and GRANTS summary judgment as to that claim.

25                **b.      Excessive Force Claim**

26        Plaintiffs also allege that Donnelly and O'Brien violated T.H.'s Fourth Amendment rights

United States District Court
Northern District of California

1   by using excessive force when attempting to enter the home. [3]  Plaintiffs assert that Donnelly's

2   "detaining" T.H. at the front door for approximately fifteen minutes, pressuring her to allow him

3   in the house to conduct a welfare check, and kicking the front door in order to keep it open

4   constituted excessive force.  Opp. at 15-17.  Defendants contend that Donnelly's force was

5   "objectively reasonable" to meet the officers' need at the time, and that he is entitled to qualified

6   immunity on this claim.  Mot. at 19.

7           "Determining whether the force used to effect a particular seizure is reasonable under the

8   Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the

9   individual's Fourth Amendment interests against the countervailing governmental interests at

10  stake." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).   Whether the officers used

11  reasonable force depends on the "facts and circumstances" of the particular case.  *C.B. v. Sonora*,

12  769 F.3d 1005, 1029 (9th Cir. 2014).  The Court judges the "reasonableness of the use of force

13  from the perspective of a reasonable officer at the scene." *Sandoval v. Las Vegas Metropolitan

14  Police Dept.*, 756 F.3d 1154, 1166 (9th Cir. 2014).  In assessing whether an officer's use of force

15  violated the Fourth Amendment, courts are counseled to "allow for the fact that police officers are

16  often forced to make split-second judgments—in circumstances that are tense, uncertain, and

17  rapidly evolving—about the amount of force that is necessary in a particular situation." *Jackson v.

18  City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (citation and internal quotation marks

19  omitted).  The Court must balance the force used against the need, to determine whether the force

20  used was "greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846,

21  854 (9th Cir. 2002).

22          For purposes of the qualified immunity analysis, the Court need not resolve the

23  ───────────────────

24  [3] In their Opposition, Plaintiffs only address Donnelly's actions and do not mention O'Brien.
    Opp. 14-18.  Rule 56 mandates the entry of summary judgment "against a party who fails to make

25  a showing sufficient to establish the existence of an element essential to that party's case, and on
    which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Liberty Lobby*,

26  477 U.S. at 250 (to survive summary judgment, non-moving party "must set forth specific facts
    showing that there is a genuine issue for trial").  Because Plaintiffs have set forth no facts

27  regarding O'Brien's use of force, Defendants are entitled to summary judgment on Plaintiffs'
    excessive force claim as to O'Brien.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    constitutionality of Donnelly's use of force.  Rather, the Court considers whether, based on the

2    facts known to Donnelly at the time he kicked the door, any reasonable officer would have been

3    on notice that using this amount of force to keep a door open in an effort to conduct a welfare

4    check was unlawful under clearly established law.  As discussed above, the Court has concluded

5    that the warrantless entry did not violate clearly established law under these circumstances.

6             Given that finding, the Court further finds that no clearly established law in August 2013

7    established "beyond debate" that using the limited amount of force at issue here was unlawful.

8    Plaintiffs do not cite any relevant law to the contrary:  instead, they cite *Espinoza* again for the

9    exigency standard, and argue that because there was "no exigency" here, any application of force

10   was excessive.  Opp. at 17-18.  *Espinoza* is inapposite, and adds nothing on the relevant question.

11   Accordingly, Donnelly is entitled to qualified immunity as to T.H.'s excessive force claim (First

12   Cause of Action), and the Court GRANTS Defendants' motion for summary judgment on

13   Plaintiffs' excessive force claim as to both Donnelly and O'Brien.

14        **B.    Battery Claim**

15            Plaintiffs' Third Cause of Action alleges that Donnelly committed a battery against T.H.

16   by using unreasonable force when he kicked the front door, causing an injury to T.H.'s shoulder.[4]

17   *See* Offense Rep., CPD-0003; Vanegas Decl. Ex. 2 at 69:22-70:1, 89:24-90:1.  The elements of

18   battery are:  "(1) the defendant intentionally performed an act that resulted in a harmful or

19   offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the

20   harmful or offensive contact caused injury, damage, loss or harm to plaintiff."  *Brown v.*

21   *Ransweiler*, 171 Cal. App. 4th 516, 526-27 (Cal. Ct. App. 2009).   Plaintiffs must show

22   unreasonable force when alleging battery against a police officer.  *See Edson v. City of Anaheim,*

23   63 Cal. App. 4th 1269, 1272 (1998); see also *Irvine v. City & Cnty. of San Francisco*, No. C-00-

24   01293 EDL, 2001 WL 967524, at *9 (N.D. Cal. July 12, 2001) (applying California law and

25   _____

26   [4] Again, while the Complaint names O'Brien, the Opposition does not mention him.  Because no
     facts are presented regarding O'Brien's purported battery, summary judgment on Plaintiffs'
27   battery claim is GRANTED as to him.  *Celotex*, 477 U.S. at 322-23 (1986); *Liberty Lobby*, 477
     U.S. at 250.  Moreover, Plaintiffs concede in their Opposition that "they cannot sustain any battery
28   claim against any Officer Defendants on behalf of K.H. or M.H."  Opp. at 18-19.  Accordingly,
     summary judgment for Defendants is GRANTED on those claims.

defining unreasonableness as additional element of battery when alleged against a police officer). Because an officer is privileged to use reasonable force while exercising his duties, a "California–law battery claim is a counterpart to a federal excessive force claim under section 1983." *Harding v. City & Cnty. of San Francisco*, No. 13-15156, 2015 WL 795603, at *3 (9th Cir. Feb. 26, 2015) (internal quotation marks and citations omitted).

In deciding Plaintiffs' Section 1983 excessive force claim above, the Court found that Donnelly is entitled to qualified immunity because clearly established law did not establish "beyond debate" that his application of force was unlawful.  As a result, the Court did not substantively analyze whether the force used was reasonable under the circumstances.  However, the qualified immunity doctrine does not apply to California torts against police officers. *Venegas v. Cnty. of Los Angeles,* 153 Cal. App. 4th 1230, 1243 (2007) ("The doctrine of qualified governmental immunity is a federal doctrine that does not extend to state tort claims against government employees.").  Therefore, the Court must determine whether there is any disputed material fact relating to the reasonableness of Donnelly's door kick based on which a jury could find that it was not the result of "due care" in the enforcement or execution of the law.  Cal. Gov't Code § 820.4 ("A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law.")

The undisputed facts show that Donnelly kicked the front door, hard enough to splinter and crack it, with knowledge that T.H. was close to it on the other side.  Blechman Decl. Ex. D at 42:12-24; Vanegas Decl. Ex. 2 at 87:1-7.  Donnelly's kick caused the door to hit T.H., injuring her shoulder.  Vanegas Decl. Ex. 2 at 69:20-70:25, 89:20-25.  T.H. did not consent to the kick and Donnelly intentionally kicked the door.  What remains to be determined is whether Donnelly's actions in kicking the door were "reasonable" or the result of "due care."  The resolution of these reasonableness questions turns on issues of fact that are best reserved for a jury, and reviewing the facts in the light most favorable to Plaintiffs, the Court cannot decide this question in Defendants' favor as a matter of law.  The Court therefore DENIES Defendants' motion for summary judgment on Plaintiffs' battery claim as to Donnelly.

United States District Court
Northern District of California

C.     **False Imprisonment Claim**

Plaintiffs' Fourth Cause of Action alleges that Defendants' actions "forcibly restrained Plaintiffs' liberty of movement against their will, without their consent and against their protests for an appreciable length of time."  Compl. ¶ 51.

The tort of false imprisonment requires: (1) nonconsensual intentional confinement of a person (2) without lawful privilege (3) for an appreciable period of time however brief.  *Lyons v. Fire Ins. Exch.,* 161 Cal.App.4th 880, 888 (2008).  Relying on *Shanafelt v. Seabord Fin. Co.*, Plaintiffs argue that "a person is falsely imprisoned if he is wrongfully deprived of his freedom to leave a particular place by the conduct of another."  108 Cal. App. 2d 420, 422-23 (1951) (upholding a verdict for damages on a false imprisonment claim where plaintiff was unable to leave her house but was able to move freely within the home).   Nominal harm is sufficient to establish the tort of false imprisonment.  *Scofield v. Critical Air Med., Inc.,* 45 Cal. App. 4th 990, 1007 (1996).  The length of time needed to "wrongfully deprive" a person of his freedom and satisfy the requirements of the tort of false imprisonment need not be lengthy.  *Fermino v. Fedco, Inc.,* 7 Cal. 4th 701, 715 (1994) ("As we recently formulated it, the tort consists of the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.") (internal citations and quotation marks omitted).

Typically, false imprisonment allegations against police officers arise in the criminal context.  In that context, California courts have held that defendant officers were operating with "lawful privilege" where there was a "good faith suspicion" to justify the detention or investigation of a suspect.  *See Dawkins v. City of Los Angeles*, 22 Cal. 3d 126, 133 (1978) ("A police officer may detain a suspect for questioning when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties.") (internal quotation marks and citations omitted).   However, the lawful privilege to detain a suspect for questioning does not extend to "mere witnesses."  *Baines v. Brady*, 122 Cal. App. 2d Supp. 957, 960 (1953) ("A citizen who is not charged with, or suspected of, a crime, cannot be arrested or detained by a policeman in the course of his duties, and any alleged inconvenience caused to the investigating authorities by this principle is far outweighed by

1   the rights of citizens to be protected in their personal liberty.").

2        Defendants claim that Plaintiffs cannot meet the standard for false imprisonment, arguing

3   that because no arrest was involved, they must prove that Defendants intentionally deprived them

4   of their freedom of movement "by use of physical barriers, force, threats of force, menace, fraud,

5   deceit or unreasonable duress."  Reply at 13 (citing Judicial Council of California Civil Jury

6   Instruction 1400 (2003)).

7        Accepting all inferences in Plaintiffs' favor as the Court must at the summary judgment

8   stage, all three of the children (T.H., M.H., and K.H.) have satisfied their burden of showing a

9   triable issue of material fact on their false imprisonment claim.  Once they arrived at the home, the

10   officers specifically told T.H. not to close the front door.   Vanegas Decl. Ex. 2 at 56:18-57:3;

11   Blechman Decl. Ex. D at 24:13-14.  T.H. was told if she didn't let the officers in or answer their

12   questions she would be "arrested."  Vanegas Decl. Ex. 2 at 53:24-54:11.  After the officers

13   removed their mother from the home, T.H. saw what looked like a can of pepper spray on one of

14   the officers, and pleaded with the officer not to spray her.  Vanegas Decl. Ex. 9 ¶ 3 (T.H. Decl.).

15   A jury could find that an officer's threat to arrest T.H., combined with the officers' use of a baton

16   and their feet to wedge the door open and T.H.'s observation of pepper spray, prevented T.H. from

17   moving away from the door and prevented any of the girls from leaving via the front door.

18   Vanegas Decl. Ex. 2 at 72:9-16; Ex. 5 at 14:4-7.  The encounter appears to have lasted at least

19   fifteen minutes, and the officers do not dispute that they blocked access to the outside via the front

20   door the entire time.  Additionally, after the other two children, K.H. and M.H., moved to the car

21   parked in the garage, an officer interacted with them with his gun drawn for at least a short period

22   of time.  Vanegas Decl. Ex. 4 at 172:1-176:15.

23        These facts are sufficient to raise a material issue of fact as to whether the officers' actions

24   amounted to false imprisonment of the three Helmantoler girls, and preclude entry of judgment as

25   a matter of law for Defendants.  Accordingly, the Court DENIES Defendants' motion for

26   summary judgment on Plaintiffs' false imprisonment claims as to T.H., M.H., and K.H.

27   **D.    Intentional Infliction of Emotional Distress Claim**

28        Plaintiffs' Fifth Cause of Action alleges that the officers acted with reckless disregard for

United States District Court
Northern District of California

any concern that Plaintiffs would suffer emotional distress during the course of the incident.  The elements of the tort of intentional infliction of emotional distress are: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."  *Davidson v. City of Westminster,* 32 Cal.3d 197, 209 (1982).

Viewing the record as a whole, and accepting all inferences in Plaintiffs' favor, there is no genuine issue of fact on the question of whether Defendants acted with the required intent or reckless disregard.  "Outrageous conduct" has been defined as conduct so extreme as to exceed all bounds of that usually tolerated in a civilized society.  *Cole v. City of Sunnyvale,* No. C-08-05017 RMW, 2011 WL 4346510, at *10 (N.D. Cal. Sept. 14, 2011) (applying California law).  Though Plaintiffs contend Defendants acted "unreasonably" when they wedged open the door, kicked the door to facilitate the eventual search, and prevented T.H. from leaving the door, unreasonable conduct does not amount to intentional or reckless conduct.  As proffered by Plaintiffs, the officers' conduct does not rise to the level of intentional or reckless outrageousness.  As a result, the Court GRANTS Defendants' motion for summary judgment on Plaintiffs' Fifth Cause of Action.

## V.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is:

1.   GRANTED on Plaintiffs' Fourth Amendment claims of unreasonable search and seizure against O'Brien and Donnelly (First Cause of Action);

2.   GRANTED on Plaintiffs' Fourth Amendment claims of excessive force against O'Brien and Donnelly as to K.H., M.H., and T.H. (First Cause of Action);

3.   DENIED on Plaintiffs' battery claims against Donnelly as to T.H., and GRANTED on Plaintiffs' battery claims against O'Brien as to T.H. (Third Cause of Action);

4.   GRANTED on Plaintiffs' battery claims against Donnelly and O'Brien as to K.H. and M.H. (Third Cause of Action);

5.   DENIED on Plaintiffs' false imprisonment claims against all Defendants as to

K.H., M.H., and T.H. (Fourth Cause of Action); and

6.       GRANTED on Plaintiffs' intentional infliction of emotional distress as to K.H.,

M.H., and T.H. (Fifth Cause of Action).

**IT IS SO ORDERED.**

Dated:  June 9, 2015

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

21